JiDECUIR, Judge.
This is a suit for damages filed by plaintiffs, James Lonnie Edwards and Pamela Strong Edwards, individually, and on behalf of their minor son, James Larkin Edwards, for injuries received by James Larkin Edwards when he ingested an indeterminable amount of cleaning fluid while visiting his aunt and uncle, Danny and Debra Strong. The Strongs and their insurer, Pelican State Mutual Insurance Company, were named as defendants. Prior to trial, Pelican was placed in liquidation and Louisiana Insurance Guaranty Association (LIGA) was substituted as a defendant.

FACTS

On August 10, 1989, James Larkin Edwards (James) was an overnight guest at the Pineville home of the Strongs. Prior to leaving for work, Debra Strong placed a glass of diluted “Believe It” cleaning fluid, which she had used the previous night to clean her jewelry, in the kitchen sink with a saucer on top. Coincidentally, the bluish colored liquid appeared similar to some Kool-Aid Debra had made for the children to drink during the day.
Toward the end of the day, five-year old James climbed up onto the counter and retrieved the glass from the sink. He took the glass to the bathroom and started to drink the diluted cleaner. When it immediately burned his mouth, James spit it out. He then poured out the remainder, rinsed the glass several times and drank some clear water.
_[aAt about 4:00 p.m., Danny Strong, who was at home with the children, was told by one of his sons that James was in bed and complaining of stomach problems. Mr. Strong concluded that the combination of Kool-Aid, junk food, and intense activity had given James a stomach ache and suggested to James that he rest.
Between 5:15 and 5:30 p.m., Debra returned from work and checked on James noting that his tongue was discolored. The empty glass was found in the bathroom and on checking the sink, Mrs. Strong discovered *442 the glass of cleaner missing. Mrs. Strong then called the Poison Hotline and, after consulting with them, rushed James to the emergency room at St. Frances Cabrini Hospital. Hospital records indicate he was admitted to the emergency room at 6:28 p.m.
Shortly thereafter, Mrs. Strong called James’ parents and informed them of the circumstances. A doctor then spoke with the Edwards and explained James’ condition. Approximately thirty minutes later, Mrs. Edwards called the hospital for an updated report on James’ condition. After this call, the Edwards drove from their home in West Monroe to the Strongs’ home in Pineville. After staying there for an undetermined time the Edwards made the fifteen minute drive to St. Francis Cabrini Hospital in Alexandria to see their son.
James was examined by several doctors and a scope was inserted through his nasal cavity to examine his esophagus and stomach. The scope tube was left in place as a precaution against vomiting or narrowing of the esophagus. On August 12, James was moved by ambulance (because of the tubes and I.V.’s) to St. Frances Medical Center at Monroe for the convenience of his family.
The doctors diagnosed grade 1 burns to the esophagus and a grade 2 burn to the wall of the upper stomach, concluding that the burns amounted to a minor injury to the stomach. On August 15, a second scope was performed, and it was noted that healing was progressing nicely. The previous concern for narrowing of the esophagus was lessened and the tube was ordered removed. On August 17, Dr. David Raines, Jr., a gastroenter-ologist, dilated the esophagus and released James to go home. On September 13th, James returned for a follow-up visit and was discharged with no restrictions to diet or activity.
In March 1990, James complained of stomach pains and was seen by Dr. Raines. Dr. Raines concluded that the previous injury was healed and that the complaints were unrelated.
At no time during this ordeal did any of the treating physicians find James in particular distress or acute discomfort. Nor did James complain of excessive pain. The scope procedures which were | .-¡necessary were conducted while James was under general anesthesia and James’ injuries were essentially healed at the time of his discharge.
Despite the horrifying images engendered by a child drinking a caustic liquid, the trial judge found that the reality was actually much more tame. The court awarded $20,-000.00 in general damages to James and declined to award any damages to his parents on their claim for mental anguish and distress related to James’ injury. The Edwards lodged this appeal.

PARENTS’ MENTAL ANGUISH

By their first assignment of error, the Edwards contend that the trial court improperly denied their claim for damages for the mental anguish suffered by them as a result of the injury to and treatment of their young son. The Edwards base this contention on their belief that the trial court misinterpreted the ruling in Lejeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990).
The threshold requirement for a mental pain and anguish claim under Lejeune is that the claimant must “either view the accident or injury causing event or come upon the accident scene soon thereafter and before substantial change has occurred in the victim’s condition.” Lejeune, 556 So.2d 559 at 570; Chamberlain v. State, Through DOTD, 624 So.2d 874 (La.1993).
In this case, the parents were notified by James’ aunt at least three hours after the injury. They did not rush immediately to the hospital but waited thirty minutes and called the hospital before leaving to go to Alexandria. In fact, our review of the record reveals that James’ parents did not see their son until approximately six hours after the injury. We cannot say that the trial court erred in concluding that these circumstances failed to satisfy the threshold requirement of Lejeune.

GENERAL DAMAGE AWARD

The Edwards contend that the trial court’s general damage award of $20,000.00 was inadequate. In making this assertion, *443 plaintiffs cite several similar cases with varying awards.
In reviewing an award for damages, the trier of fact is vested with much discretion. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429 (La.1991). Before an appellate court can disturb an award made by the trial court, the record must clearly reveal that the trier of fact abused its discretion in making the award. In the event the appellate court finds from the record an abuse of discretion, the award may be disturbed by lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded the trier of fact. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Carollo v. Wilson, 353 So.2d 249 (La.1977); Migues v. Hebert, 93-1509 (La.App. 3 Cir. 6/1/94); 640 So.2d 670.
In addition, we reiterate the position of this court that a damage award should be determined by the facts or circumstances peculiar to the case under consideration. Berthelot v. Leday, 606 So.2d 1 (La.App. 3 Cir.1992); see also Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (La.1963). The primary objective of the trier of fact in fixing the award in a personal injury case is to adequately compensate the injured person for his injury under the facts shown to exist in his case. Berthelot, supra.
After carefully reviewing the entirety of the evidence in this ease, we conclude that the trial court’s award constitutes an abuse of discretion. We have examined awards in other similar cases and find that an award of $20,000.00 is abusively low for this type of injury. We find that an appropriate award is $50,000.00, and amend the trial court’s judgment accordingly.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed as amended. All costs of this appeal are assessed against defendants-appellees.
AMENDED AND AFFIRMED.